# Employment Research Corporation

305 E. Eisenhower Pkwy, Suite 316, Ann Arbor, MI 48108 ▪ Phone: 734-477-9040 ▪ Fax: 734-477-9060

August 9, 2013

Carter Crow
Fulbright & Jaworski LLP
Fulbright Tower
1301 McKinney
Suite 5100
Houston, TX 77010-3095

Re: <u>Robert Barnard, et al v. Intertek USA Inc. d/b/a Intertek Caleb Brett</u>

Dear Mr. Crow,

You asked me to provide expert opinions in this matter, including comments on the expert reports of Robert B. Speakman, Jr., PhD, of Welch Consulting, and the report of David M. Breshears, CPA/CFF regarding the possible economic loss of Intertek USA Inc. d/b/a Intertek Caleb Brett (Intertek) employees due to certain pay practices covered by the FLSA, including the calculation of damages consistent with alternative legal interpretations of the prevailing regulations.

## I.     My Background

I am the president of Employment Research Corporation, a firm located in Ann Arbor, Michigan, that specializes in employment and wage and hour research.  I obtained my Ph.D. in Economics from MIT, with specialties in Econometrics and Labor Economics.  After graduating from MIT, I worked for the U.S. Bureau of Labor Statistics in Washington, D.C.  I have taught at the University of Maryland, the University of Michigan, and the University of Minnesota. The classes I have taught include Statistics, Economics, Labor Market Information, Human Resource Management, Human Resource Information Systems, Econometrics, and Human Resource Auditing.  I served as Director of the Institute of Labor and Industrial Relations at the University of Michigan from 1980 to 1993.  I have conducted extensive research on labor market issues, new hires, labor shortages and labor market information.  I have written over 50 articles and books on related topics.  I have either testified or been a consultant in over 1,000 audits or cases and testified over 150 times.  I have been consulted, testified or written reports in over 30 wage and hour cases.  In many of these cases I had to examine detailed payroll and time records.  I have testified in over 100 cases in 15 states where I computed employee expenses.  I have also served as an expert to the EEOC and U.S. Department of Labor.

Under contract to the Wage and Hour Division of the U.S. Department of Labor, I prepared detailed estimates of the number and characteristics of the exempt and non-exempt employees for congressionally mandated minimum wage studies published in June 1998 and January 2001.  Also, under contract to the Wage and Hour Division, I prepared a report describing major changes in the U.S. economy and estimating how those changes would impact the viability of 29 CFR § 541 regulatory requirements (namely, The "New Economy" and Its Impact on Executive, Administrative and Professional Exemptions to the Fair Labor Standards Act (FLSA)). The DOL submitted each of these

EXHIBIT "6"

# ⌐¡ Employment Research Corporation

reports to the U.S. Congress for its information and use in considering proposed regulations and legislation.  My Curriculum Vitae and disclosures are attached as Appendix A.


II.    **Documents relied upon**

I relied on the following information in preparing my report:

A.  Expert report of Robert B. Speakman, Jr. PhD, of Welch Consulting, dated February 12, 2013.

B.  Expert report of David M. Breshears, CPA/CFF, dated February 12, 2013.

C.  Plaintiff's First Amended Complaint.

D.  Plaintiffs' Answers to Interrogatories, including Supplemental Answers.

E.  Joint Stipulation Regarding Conditional Certification and Notice to Dispatchers.

F.  Deposition transcripts of Bryan Ahrens, DuWayne Gilyot, Kenneth Vordenbaum, Kevin McFadden, Patrick Cary, Q VanBenschoten, Michael Boudreaux, Michael Canales and Robert Barnard, with exhibits.

G.  PDF files of various pleadings, motions and rulings (See Appendix B).

H.  PDF files of expense report documents (See Appendix C).

I.  Copies of job vouchers and time sheets for a number of opt-ins.

J.  A spreadsheet including employment information, location data and opt-in dates and dates of signed Adeva releases for the individuals who have filed consents to join the lawsuit.

K.  Electronic payroll data covering the period 6/27/2008 to 12/21/2012.

L.  Electronic expense reimbursement data covering the period 12/14/2008 to 11/21/12.

M.  Mileage charts for various Intertek locations.

N.  AAA study, 2012 Edition, "Your Driving Costs."

O.  Per Diem rates for meals and incidental expenses from the U.S. General Services Administration (GSA).

P.  Mileage reimbursement rates from the GSA.

Q.  Data from the Internal Revenue Service (IRS) on mileage reimbursement rates.

R.  Collective Bargaining Agreement between Intertek Oil, Chemical & Agri for its inspectors in the New Jersey/New Your Metropolitan Area and the United Steel Workers Union, and its Local 397 USW, effective March 31, 2009-March 31, 2013.

S.  US Department of Labor, Wage and Hour Division, Field Operations Handbook, Chapter 30, downloaded on 7/18/2013.

T.  29 CFR §778.217 Reimbursements for Expenses.  You provided legal interpretations of the meaning of this section.

# ⌐¡ Employment Research Corporation

U. Declarations from James George Graca regarding Romeoville, IL (Aug. 2, 2013), Walter Griffin regarding Pasadena/Houston Ops, TX (Aug. 6, 2013), David Lunceford regarding Marion, AR/Memphis, TN (Aug 7, 2013), Frank Bilski regarding Carteret, NJ (Aug 7, 2013), Bill Johnson regarding Essington/Philadelphia, PA (Aug. 8, 2013), Joey Herrington regarding Corpus Christi, TX (Aug. 7, 2013), Mark Breland regarding Lake Charles/Sulphur, LA (Aug. 7, 2013), Mike Lord regarding Texas City, TX (Aug. 7, 2013), Earl Smith regarding Carteret, NJ (Aug. 8, 2013), Mark Thoreson regarding Signal Hill/Los Angeles, CA (Aug. 8, 2013), Shawn Bliek regarding Pasadena/Houston Ops (Aug. 6, 2013), Daron Keel regarding Nederland, TX (Aug. 8, 2013) and Gerard Landeche regarding St. Rose/New Orleans, LA (Aug. 8, 2013).

V. Mileage reports from 2000-2002, INTERTEK 070294-078592.

W. Interviews with Kevin McFadden, Vice President Global Risk Management.


### III.    Introduction

Intertek is a multinational company which centers its business on product testing, inspection and certification.  Specifically, the commodities division provides a variety of testing, inspection and certification services for clients in various industries.

Intertek commodities division inspectors, among other duties, collect samples from the company's clients and deliver them to testing laboratories.  These inspectors drive to locations which may only be a few miles from their office or to locations which may be several hundred miles from their office. Some routes require an overnight stay. Each office sets its own policy of how to reimburse the employees within each branch for expenses incurred, including meals and mileage. The branches require inspectors to provide a personal vehicle for work in order to travel to the customer locations from which they provide testing and inspections.

Intertek also employs dispatchers, who coordinate work assignments and may also be required to travel to client locations.  Dispatchers are also required to own a vehicle which they can use for work.

According to the amended complaint, plaintiffs claim that the amounts paid by Intertek for meal, auto and mileage reimbursements exceed the costs to the employees, and therefore should be considered a part of wages and included in the regular rate of pay.

I was provided with information on 390 individuals who were or are potential class members.  The data in this report is based on a subset of 338 employees, 325 of whom were ever inspectors and 13 of whom were only dispatchers.[1]  Among the 325 inspectors, 13 were also dispatchers at some point during the relevant time period. It is my understanding that dispatchers are a separate class.


### IV.    Description of Inspector Duties

---

[1] Excluded from the list are individuals who have been or should be dismissed for various reasons such as statute of limitations, or signed Adeva releases, or those who are not eligible for damages.

# ⊡ Employment Research Corporation

To provide context for my comments about the reports of Dr. Speakman and Mr. Breshears, it is important to understand the nature of the work performed by inspectors. The depositions describe a variety of duties and include both shift and on-call employees. In these depositions, the plaintiffs provide information on their typical days working as inspectors in different branches for Intertek.

According to Mr. Vordenbaum, a former inspector in the Pasadena/Houston Ops, TX branch office, being an inspector "is not a Monday through Friday job. This happens 24 hours a day seven days a week."[2] Mr. Boudreaux testified to being on "24 hour call-out" in Gonzales, LA, and has worked up to twenty-four hours in a day. A recent job, for example, was from 9:00 pm to 2:00 am. Mr. Boudreaux explains that he does not work a set schedule, but instead goes to work whenever he is called, at any time he is on call, day or night.[3]

Mr. Canales also explained the on-call system that he works under in Corpus Christi, TX. "Once we are on call, we get a call from our dispatcher or coordinator. They give us an hour, two hour notice to get to the job site." He would then go to the office to get his equipment and any specific information related to the job, and then drive to the job site.[4]

Mr. Barnard who works at Pasadena/Houston Ops, TX described his typical day as an Intertek inspector: "Well, I arrive at the office; and then we get our assignments from dispatch. And depending on where it is, we may have to drive to one place or the other, you know, mostly, you know, doing inspection work, gauging/sampling barges, ships, shore tanks, railcars, you name it, sample and take them to the lab." He then returns to the office where, "if they have something else pending, waiting for us, we may have to go to another terminal to do another job."[5]

Not all inspectors go to different locations each day. Mr. Cary, a shift inspector in Pasadena/Houston Ops, TX explains that "I work a shift at Kinder Morgan...so I'm specified at that particular terminal, so I already know who I'm relieving each shift." He describes the work as "Climb a tank, gauge it for product. Pull samples, run samples to the lab, gauge another tank. I repeat the process. Gauge a barge, pull samples, go to the lab, come back to the office, do paperwork, go climb another tank, get on a ship."[6]

Because the inspectors do not work typical nine-to-five hours, they often do not eat at typical meal times. Mr. Canales explains "this job—you know, it's a 24/7 job...you just don't go to lunch at 11:00 or 12:00 or go to lunch at 6:00. I mean, it's all hours of the day, this job, so...my lunch break could be...1:00 in the morning, 2:00 in the morning. Dinner could be...8:00 in the morning."[7] Mr. Barnard explains "we don't have a scheduled lunch break"[8] and he eats meals, "when the scope of work permits." Mr. Cary sometimes chose to eat at McDonald's or Taco Bell because of the location "close to the job site or office."[9] Like the other plaintiffs, Mr. Cary indicated that "we really don't take lunch

---

[2] Vordenbaum deposition p 22.
[3] Boudreaux deposition p 55-56,62.
[4] Canales deposition p 42-43.
[5] Barnard deposition, p 25-26.
[6] Cary deposition, p 19, 36.
[7] Canales deposition, page 68.
[8] Barnard deposition page 149.
[9] Cary deposition, p 98.

# ⬜j Employment Research Corporation

breaks."[10] As Mr. Ahrens explains, he gets his lunch to go, "when I leave, I take it with me. By the time I get to the terminal, I'm done."[11] [12]

Mr. Gilyot testified that "you just can't pick up and leave in the middle of a job . . . there's just no way you can do it . . .it's too much money involved.  It's too many variables.  You work for a client.  You just can't walk off a job and go eat."[13]

## V.      Dr. Speakman's Report

Dr. Speakman prepared a report in response to my December 7, 2012 report, elements of which I have included in this report for reference.  I find Dr. Speakman's criticisms to be without merit and address his points below.

### A.  Dr. Speakman assumes the plaintiffs are similarly situated with respect to mileage reimbursements.

Dr. Speakman fails to recognize the differences in Intertek locations.  Intertek facilities have various ways of reimbursing inspectors for miles driven.  In the different facilities represented by the opt-in plaintiffs, there are more than 20 states and over 30 locations.  There is variation on factors including mileage rate paid, whether or not there is a customized rate chart paying set amounts to particular locations such as customers, terminals or laboratories, and whether or not inspectors are paid for all miles driven, or whether there is an exclusion for in-town miles for which inspectors are not paid (these exclusions vary from 10 to 40 miles round trip). Some locations in Texas also pay a flat rate per day to cover in-town miles, and this flat rate ranges from $10-25, and may or may not have an additional mileage exclusion.  Other locations simply pay a per mile rate for miles driven.  One location, Carteret, NJ, has been subject to three collective bargaining agreements (CBAs) since 2006, with varying amount of reimbursement for expenses.

Specifically, looking only at facilities with ten or more opt-ins, Pasedena/Houston Ops, TX pays a flat rate of $25 for in-town miles.  Texas City pays $10 or $15,[14] depending on duties, plus they reimburse mileage outside of Texas City.  Essington, PA pays drivers $3 per trip for in-town trips (within a 20 mile radius from the office).  Corpus Christi, TX uses a specialized rate sheet indicating the dollar amount reimbursed for particular locations outside of a 20-mile radius.  Other locations (Carteret, NJ, Essington, PA, Nederland, TX, New Orleans/St. Rose, LA, Marion, AR/Memphis, TN, and Lake Charles/Sulphur, LA) use a rate sheet specifying the number of miles to be expensed for particular routes; however, Marion/Memphis and Romeoville branches do not subtract in-town

---

[10] Cary deposition, p. 97.

[11] Ahrens deposition, p 86.

[12] We do not have deposition testimony from opt-ins regarding dispatcher duties, with the exception of a description by Mr. Canales of his once per month dispatcher duties.

[13] Gilyot deposition, p. 147.

[14] Mile Lord declaration.

# ⊏ ¡ Employment Research Corporation

miles while other branches do.  In addition, there are other variations, such as the rate charts for some locations which are set using a fixed dollar amount, meant to take account of some driving within the terminals or job sites, or to and from a hotel during overnight travel for work, while other branches simply indicate the mileage allowed for driving to given locations and do not include these additional expenses.

The geography of the locations plays a role in the typical work of inspectors.  For example, even within Texas there is great variety, as inspectors in Corpus Christi typically drive long distances, whereas inspectors in Pasadena/Houston Ops, TX typically drive within a more local area.  In addition, Corpus Christi uses a rate sheet to determine reimbursements for travel to customer locations whereas Pasadena/Houston Ops, TX pays a flat reimbursement per day for local driving.  Even within certain branches, inspectors have different routes and differing circumstances, with some inspectors doing on-call work and others doing shift work, which can affect job assignments.

B.   **Dr. Speakman's report uses a measure for calculating driving costs based on incremental use analysis which is inconsistent with the guidance in the Field Operations Handbook**.  In Chapter 30 of the Field Operations Handbook of the U.S. Department of Labor, Wage and Hour Division, car expenses are discussed (emphasis added).[15]

> **30c15 Car expenses – employee's use personal car on employer's business.**
>
> (a)  As an enforcement policy, the Internal Revenue Service (IRS) standard business mileage rate found in IRS Publication 917, "Business Use of a Car." may be used (in lieu of actual costs and associated recordkeeping) *to determine or evaluate the employer's wage payment practices for FLSA purposes*.  The IRS standard business mileage rate…represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees.  In situations where the IRS rate changes during the investigation period, the applicable rates should be applied on a pro-rata basis.
>
> (b)  The IRS standard business mileage rate may be used in lieu of actual costs for FLSA purposes whether or not the employee will be able to take a deduction on his or her tax return for the business use of the employee's car.

It would appear from Dr. Speakman's analysis that since his method of determining mileage reimbursements for employees driving their own vehicles for work is to consider only incremental costs; therefore, any company or organization reimbursing non-exempt employees using an IRS mileage rate could be considered by his analysis to be excessively reimbursing their employees resulting in an incorrect regular rate computation and a violation of the FLSA.

It should be pointed out that the Wage and Hour Administration does not limit business mileage recovery to the IRS rate but allows an employer to use that rate "in lieu of actual costs."  If actual costs are more, the employer is not precluded from considering them when estimating expenses.

---

[15] http://www.dol.gov/whd/FOH/FOH_Ch30.pdf, downloaded 7/18/2013.

# ⸤⸥ Employment Research Corporation

**C. Dr. Speakman asserts that the driving costs per mile listed in my report, based on figures from AAA and the IRS, overstate costs per mile.**

It is my understanding, which I asserted in my report, that Intertek reimburses inspectors for automotive expenses using auto allowances (approximately $81/week, or $4,200 per year) and mileage/toll reimbursement for trips taken.[16] I have been provided with mileage reimbursement schedules for various Intertek locations. Based on these schedules as well as a review of the expense forms, it appears that many locations reimburse at a rate of $0.30 per mile. There is substantial variation on whether "in-town" trips are excluded from the mileage rate, with those locations employing such an exclusion varying in the definition of "in-town" from ten to 40 miles. Further, some Texas locations pay a flat rate for in-town miles, which varies depending on branch office and policies. With such vast differences in reimbursement and individual costs, no simple formula can be used to generalize when expense reimbursements are excessive. It requires a case by case examination.

In order to determine if the amount paid by Intertek for auto allowances and mileage reimbursements exceeds the employees' cost of driving, I consulted data from a study published by the American Automobile Association (AAA). The AAA study gives the following cost per mile based on mileage:

| Table 1: Cost Per Mile, AAA 2012 Edition, Your Driving Costs | | |
|---|---|---|
| Miles per year | Cost per mile (composite average of car type) | Cost per mile (4WD SUV)* |
| 10,000 | 77.1 cents | 98.5 cents |
| 15,000 | 59.6 cents | 75.7 cents |
| 20,000 | 50.7 cents | 64.2 cents |

*Based on the plaintiffs' answers to interrogatories, costs associated with larger vehicles are included.

The IRS sets a mileage reimbursement rate which may be used in lieu of actual costs which correspond to a driver of an average size car that drives between 15,000 and 20,000 per year. The Wage and Hour Administration Field Operation Handbook indicated that the IRS rate may be used in lieu of actual costs.

| Table 2: IRS Mileage Reimbursement Rate, 2009 to 2012 | |
|---|---|
| Date | IRS Rate |
| 2009 | $0.550 |
| 2010 | $0.500 |
| 1/1/2011-6/30/2011 | $0.510 |
| 7/1/2011-12/31/2012 | $0.555 |
| 1/1/2013 - present | $0.565 |

---

[16] One location, Carteret, NJ operated under a collective bargaining agreement (March 31, 2009-March 31, 2013) and paid a larger auto allowance, approximately $183 per week. As of April 1, 2013, a renegotiated CBA went into effect.

# ⌐¡ Employment Research Corporation

Driving costs per year will vary substantially based on the type of car driven, maintenance costs, road conditions and other factors.

The table below shows the auto allowance, in terms of allowance per mile, and the mileage reimbursement, compared with the cost of driving according to the AAA study, and the IRS rates.

| Table 3: Auto Allowance and Reimbursement Per Mile, compared with AAA Cost per Mile[17] | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| Number of miles per year | Auto Allowance | Auto Allowance per mile (B/A) | Mileage Reimbursement | Reimbursement per mile (C+D) | Cost per mile (average vehicle) | Cost per mile (4WD SUV) |
| 10,000 | $4,200 | $0.42 | $0.30 | $0.72 | $0.77 | $0.99 |
| 15,000 | $4,200 | $0.28 | $0.30 | $0.58 | $0.60 | $0.76 |
| 20,000 | $4,200 | $0.21 | $0.30 | $0.51 | $0.51 | $0.64 |

Note that to the extent that drivers drive more than 20,000 miles per year and their total reimbursement increases, their reimbursement per mile will decrease.  For example, at 40,000 miles per year, reimbursements per mile would be 41 cents per mile (11 cents auto allowance plus 30 cents mileage reimbursement); however, since according to the Wage and Hour administration, the IRS mileage rate can be used (currently 56.5 cents per mile) looking at higher mileage bands is not relevant to the analysis assuming that a 56.5 rate is permissible).  Furthermore, at higher mileage bands, depreciation is higher than reflected in the AAA tables, increasing costs.

I reported that in every mileage band, the formula amount paid by Intertek for auto allowance and mileage reimbursement as reflected in Column E of Table 3 does not exceed the AAA cost per mile. This analysis does not account for the facilities that pay flat rate allowances for in-town driving. Section G, below, discusses the flat rate location in further detail, and shows that even when flat rates are paid they reasonably approximate driving expenses.

Dr. Speakman asserts that the cost per mile should be based only on the incremental cost of driving, and not at all on the cost of vehicle ownership.  He calculates the incremental costs per mile at 23.9 cents, which is less than half of the costs published by AAA or by the IRS (and allowed by the DOL Field Operations Handbook). The reasons for this decrease are that Dr. Speakman's estimates of depreciation include only the incremental costs of depreciation as more miles are driven, not the full cost.  As Dr. Speakman explains in his report, depreciation "includes both fixed and variable components." However, in his estimates of the cost of depreciation due to miles driven for work Dr.

---

[17] This analysis excludes the "flat rate" paid in some Texas locations for "in-town" driving.

# ⌐¬ Employment Research Corporation

Speakman ignores fixed costs and only considers variable costs.  It is undisputed by plaintiffs that having a car is a requirement for working at Intertek.[18]  Thus, using Dr. Speakman's reasoning, one could argue that the fixed costs of vehicle ownership should be ascribed to miles driven for work.

Dr. Speakman's calculations rest on the assumption that the primary purpose of the employee's vehicle is for personal use, which is clearly inconsistent with the facts in this case.  Although this argument may be irrelevant if one relies on the IRS mileage rate as specified in the Field Operations handbook, it is also inconsistent with deposition testimony.  For example, in Mr. Boudreaux's case, he testified that he uses his truck only 5% for personal use.  Mr. Boudreaux testified that his family had three vehicles: a family car, and two work cars.  His primary work car is a pick-up truck.[19]  Five of the seven depositions we reviewed indicated the employee used a mostly dedicated work vehicle.[20]  We understand that these were the only plaintiff depositions that have been taken to date.

In summary, Dr. Speakman's incremental analysis of driving expenses is misleading and irrelevant.  Based on the evidence, and the requirement of having a vehicle, it would be more reasonable to ascribe the full cost of driving to work miles.  In addition, it should be noted that driving a truck is more expensive than driving a car, and this must be taken into account when determining whether Intertek's reimbursements are disproportionately large.

D. **Dr. Speakman fails to account for the higher costs of driving larger vehicles.**  Based on information I obtained from the plaintiffs' answers to interrogatories, it would seem that the current IRS/GSA rates of 56.5 cents per mile may actually underestimate plaintiffs' costs of driving, due to the types of vehicles they drive.[21]

Because Intertek drivers do not typically drive regular cars, but in fact most frequently drive pick-up trucks, the cost per mile they incur may be even higher than would be covered by the IRS mileage rate.  Their choice of trucks is consistent with job requirements which necessitate carrying testing equipment to job sites and transporting chemicals and samples to laboratories.  The table below summarizes the primary type of car driven according to interrogatory answers.  When multiple cars were mentioned, I selected the car for each plaintiff that they drove for the longest number of years since 2008.  Nineteen of plaintiffs provided no information about the type of car they drove.  Among those who responded to the question, only 80% of plaintiffs were able to indicate the type of car they drove.  Even some plaintiffs that currently worked for Intertek or worked there in the past 2 years did not answer the type of car they drove.

---

[18] Canales deposition, page 38, declarations of Smith, Thoreson, Bliek, Landeche, Lord, Breland, Herrington, Johnson, Bilski, Lunceford, Griffin, Keel and Graca.

[19] Boudreaux deposition, p. 32-37.

[20] Gilyot deposition, p. 267, Ahrens deposition, p. 68, Canales deposition, p. 38-42, Vordenbaum deposition, p. 86, Boudreaux deposition, p. 32-36.

[21] According to the AAA study.

# ⌐¡ Employment Research Corporation

| Table 4: Summary of Vehicles Driven by Plaintiffs Responding to Interrogatory Regarding Vehicle Type* | | |
|---|---|---|
| Type of car | Number | Percent (among those answering the question) |
| Pick-up truck | 181 | 67% |
| Car | 41 | 15% |
| SUV/SPV | 29 | 11% |
| Minivan | 7 | 3% |
| Van | 1 | 0% |
| Multiple types of cars – vehicle driven for the longest time period could not be determined | 11 | 4% |
| | | |
| | | Percent (of opt-ins) |
| | | |
| Total answered question | 270 | 80% |
| | | |
| Provided no answers | 4 | 1% |
| Provided answers but did not provide information regarding vehicle or answered with "do not recall" or similar | 64 | 19% |
| TOTAL opt-ins | 338 | 100% |

*Includes both inspectors and dispatchers

While 78% drove an SUV or pick-up truck as their primary vehicle during the period, a full 86% drove a pick-up truck or SUV as one of the vehicles they drove for work.  According to AAA, the cost per mile to drive a 4WD Sport Utility Vehicle is $0.76 per mile for those who drive 15,000 per year, and $0.99 per mile for those who drive 10,000 per year.

Since the vast majority of inspectors and dispatchers drive trucks, a reimbursement averaging between $0.64 per mile and $0.99 per mile could reasonably cover costs.

E. **Dr. Speakman fails to address a key point.** Dr. Speakman does not address my analysis of Intertek's meal expense reimbursements, as he states it is irrelevant because, "the inclusion of the meal allowance in the regular rate is not dependent upon actual meal expenses."  It is unclear how he reaches this conclusion.

It is my understanding that §778.217 of Title 29 of the Code of Federal Regulations specifically addresses the issue of expenses and reads as follows (emphasis added):

§778.217 - Reimbursement for expenses.

(a) General rule. Where an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses. *Payments made by the employer to cover such expenses are not included in the employee's regular rate (if the*

# ⌐¡ Employment Research Corporation

*amount of the reimbursement reasonably approximates the expenses incurred).* Such payment is not compensation for services rendered by the employees during any hours worked in the workweek.

(c) Payments excluding expenses.  It should be noted that only the actual or reasonably approximate amount of the expense is excludable from the regular rate.  If the amount paid as "reimbursement" is disproportionately large, the excess amount will be included in the regular rate.

It is my understanding that because Intertek inspectors travel away from home on employer business, including but not limited to overnight travel, as well as work through the supper hour and other circumstances in which providing a meal could be for the employer's convenience, these meal expenses would be reimbursable.

F.   **Dr. Speakman presents a misleading example calculation in his report.**  Mr. Cary, who was used as an example in Dr. Speakman's report, drives a minimum 25 miles per day and is reimbursed at $25 per day. Although Mr. Cary mentions several different estimates of the amount he may drive, from 25-60 miles per day,[22] Dr. Speakman uses 25 miles per day, which is the lowest estimate.

In addition, Mr. Cary is not representative of all employees at all facilities.  Less than half of opt-ins are subject to a daily flat rate. Mr. Cary also testified his mileage reimbursement and auto allowance does not cover his expenses.[23]

In contrast, if Dr. Speakman had used the testimony of one of the other deponents, Mr. Boudreaux, his analysis would have been different.  To my knowledge, Mr. Boudreaux was the only plaintiff to submit detailed odometer logs in his supplementary interrogatory answers.  I used his reported mileage from his interrogatory answers and compared it to the actual reimbursements he received. Mr. Boudreaux's average annual mileage reimbursement was $12,749.  His cost of driving, according to the AAA study was $13,124.  My calculations show that he did not receive more than the cost of driving as measured by AAA, even taking into account the fact that Mr. Boudreaux claimed that he was sometimes reimbursed at double the mileage rate.[24]

This deficiency in reimbursement is consistent with his own deposition testimony, where he stated that he did not believe the reimbursements he received from Intertek covered the expenses he incurred driving for the company.[25]

---

[22] Cary deposition, p. 66-68.

[23] Cary deposition, p. 89.

[24] Mr. Boudreaux testified that on January 21, 2013, when he went to Nustar-St. James in order to do two different jobs on the same day, he was allowed to charge the distance for both trips individually, even though he made only one round trip, essentially indicating double the mileage actually traveled. He states that "the company, as per their policy, allows me to charge two trips. If I have to do two different jobs, they allow me to charge two different trips." (Boudreaux deposition, p. 155).

[25] Boudreaux deposition, p. 205-206.

# ⊓⌐j Employment Research Corporation

G. **Dr. Speakman concludes that the mileage reimbursements paid by Intertek exceeds the cost of driving.** Dr. Speakman shows a table in his report which purports to calculate the cost per mile driven, and concludes that Intertek employees' reimbursements exceed their driving costs.

We were provided with mileage of persons driving for branch offices of Intertek for 2000-2002.[26] The data were not in machine readable format and some months were missing. For 2002, we had data for nine months. An examination of the data indicated that most of the persons appeared to be making trips to various facilities and collecting samples. We computed the mean number of miles driven by branch. Table 5 shows the average monthly number of miles driven for each branch. That number ranges from 1453 in Carteret, NJ to 2066 in Chicago, IL (Romeoville). Based on my interviews with Kevin McFadden, the locations to which employees drive have remained fairly constant among branches for the past 15 years.[27]

| Table 5: 2002 Average Miles Driven per Month | | |
|---|---|---|
| **Branch** | **Person-Months** | **Mean** |
| **Pasadena/Houston Ops, TX** | | |
| Bayport, TX | 39 | 1630 |
| Deer Park, TX | 30 | 1426 |
| Total/Mean | 69 | 1541 |
| | | |
| **NY / NJ** | | |
| Linden, NJ (Carteret, NJ) | 41 | 1465 |
| New York Harbor, NY (Carteret, NJ) | 4 | 1330 |
| Total/Mean | 45 | 1453 |
| | | |
| **Others** | | |
| Chicago, IL (Romeoville) | 83 | 2066 |
| Gonzales, LA | 238 | 1815 |
| Lake Charles, LA (Sulphur) | 74 | 1598 |
| Los Angeles, CA (Signal Hill) | 112 | 1576 |
| Nederland, TX | 66 | 1620 |
| New Orleans, LA (St. Rose) | 130 | 1750 |
| Philadelphia, PA (Essington) | 207 | 2014 |
| Texas City, TX | 23 | 1641 |

---

[26] Intertek 070294-078592.

[27] We relied on mileage summaries included in the documents, which we assume were an accurate representation of the underlying supporting documents. We also assumed that the miles driven were generally representative of miles driven by inspectors in the various branches. We removed known non-inspector employees.

# ⌐¡Employment Research Corporation

Inspectors are paid an auto allowance of $4,200 per year. In addition, Pasadena/Houston OPS, TX pays inspectors a flat rate of $25 per day. Assuming the average inspector works 250 days per year (5 days a week for 50 weeks per year), their annual reimbursement would be $6,250 for the flat rate and $4,200 for the auto allowance, for a total of $10,450 per year. The average driver in Pasadena/Houston Ops, TX drove 1,541 miles per month, as per Table 5 above, or 18,492 miles per year. Using the IRS mileage rate of 55.5 cents per mile (valid 7/1/11-12/31/12), the estimated cost would be $10,263.

This does not take into account that most plaintiffs drive trucks, the cost of driving a truck according to Table 3 is between 64 and 76 cents per mile, for mileage between 15,000 and 20,000 according to the AAA study. At 70 cents per mile, the cost of driving would be $12,944. Even if inspectors drove an average of more than five days per week, these calculations suggest that Intertek has set reimbursement rates that are reasonably approximate to costs and certainly not disproportionately large relative to cost.

Carteret, NJ pays a larger auto allowance than any other branch, probably reflecting that costs of driving in New York and New Jersey are higher than highway driving in Texas. However, despite the higher costs reimbursed, the union representing the inspectors filed a grievance in Spring, 2011 alleging that due to the increase in gasoline prices, the mileage reimbursement ought to be increased. Intertek declined to increase the mileage reimbursement amount.[28] To argue that the mileage reimbursements in Carteret, NJ are disproportionately large, when the union argued that they are too low, seems inconsistent.

Romeoville, IL, which services Chicago, is quite different. They reimburse actual mileage at $0.30 per mile, plus the auto allowance. In 2002, the average driver in Chicago drove approximately 2,000 miles per month, or 24,000 per year. At $0.30 per mile, this would be $7,200, plus the auto allowance of $4,200 would be $11,400 per year. At 55.5 cents per mile, the allowable IRS mileage would be $13,320.

In Sulfur, LA, in 2002, the average inspector drove 1,600 miles per month, or 19,200 per year. However, in Sulfur, the inspectors are reimbursed based on the distance between the branch office and client locations, less a 10 mile radius around the branch, which is yet another reimbursement method. At 55.5 cents per mile, the allowable IRS reimbursement would be $10,656. If employees were reimbursed 30 cents per mile, they would receive $5,760 for mileage and a $4,200 auto allowance, or $9,960 per year. If they were driving a truck, the costs would be higher.

Joey Herrington, the branch manager in Corpus Christi estimated that the average inspector drove 183 miles per day in June 2013.[29] Assuming inspectors work 250 days per year, the average inspector would drive 45,750 miles per year. At 55.5 cents per mile, the cost of driving would be $25,391, using IRS reimbursement rates. At 30 cents per mile inspectors would receive $13,725 plus the $4,200 auto allowance, which would be $17,925. However, inspectors driving that many

---

[28] Declaration of Frank Bilski, Aug. 7, 2013.

[29] Declaration of Joey Herrington, Aug. 7, 2013.

# ⌐¡ Employment Research Corporation

miles could have lower per mile costs than the IRS rate.  Nevertheless, once again, there is no evidence that inspectors' costs exceed their reimbursements.

According to Mr. Harrington, even though the average inspector drove 183 miles per day during the month of June 2013, the number of miles driven outside a 20 mile radius of the branch office ranged between 160 to 5,265 miles.

In summary, Dr. Speakman's analysis is misleading because he assumes plaintiffs are similarly situated, when there are vast differences in policies and assignments by branch.  He also assumes only the incremental cost of driving is attributable to work miles, when government policies indicate otherwise. He also ignores the fact that plaintiffs typically drive larger vehicles, which cost more to operate.  Due to his faulty assumptions, his conclusions that reimbursements exceed costs are incorrect, and not helpful to a trier of fact.

## VI.   Mr. Breshears' Report

Mr. Breshears provided a report which presents a damages calculation of 337 plaintiffs by assuming a violation of the FWW method of calculating overtime and the inclusion of all meal and mileage reimbursements in the regular rate of pay.  Mr. Breshears' report is problematic for a number of reasons and does not provide helpful information to a trier of fact.  Below I list specific errors I uncovered in Mr. Breshears' report.

**A. Mr. Breshears calculations of the regular rate for FWW employees is inconsistent and could be incorrect.**  Mr. Breshears calculates the regular rate in two components.  The first component is the same for both FWW and hourly workers, and consists of regular pay divided by regular hours.  The second component is different for FWW and Hourly workers and is based on what he calls "Other Compensation." Quoting from Mr. Breshears report,[30]

   i.   For FWW, the Regular Rate of Pay for other compensation is calculated by dividing the total of the following categories of earnings: Holiday, Days Off, Off Shore, and Mileage and Meal Allowance by Regular Hours worked, as reflected in the Summary of Earnings.
   ii.  For Hourly pay type, the Regular Rate of Pay for other compensation is calculated by dividing the total of the following categories of earnings: Holiday, Days Off, Off Shore, and Mileage and Meal Allowance by Regular Hours plus Overtime Hours worked, as reflected in the Summary of Earnings.

The problem with Mr. Breshears' approach is that what he calls "other compensation" should be divided by total hours worked for both FWW and Hourly workers.  If the plaintiffs' argument is that the people paid under FWW should have been paid as Hourly, then the overtime should be calculated in the same way for both groups.

When explaining his methodology for calculating the regular rate for FWW employees, he states, "I have been informed by counsel that non-compliance with the FWW requirements

---

[30] Breshears report, p. 7-8.

# ⌐ɪ Employment Research Corporation

would require the total wages to be divided by the regular hours worked (up to 40 hours per week) as opposed to all hours worked." I have not been informed of any such requirement for total wages, which includes so-called "other compensation."

If the court were to decide that this methodology is incorrect, the effect of Mr. Breshears' assumption is to overstate the regular rate for FWW employees, leading to an overstatement in calculated damages.

**B. Mr. Breshears includes types of pay that are not relevant to this action.** Mr. Breshears calculates damages based on amounts paid for holidays, days off, offshore days. A review of the Plaintiff's First Amended Complaint yielded no mention of a claim related to holiday, days off or offshore pay. The complaint specifically indicates that the plaintiffs believe that meal and mileage reimbursements and the auto allowance should be included in the regular rate, but makes no mention of holiday, days off or offshore pay. Mr. Breshears' inclusion of holiday, days off and offshore pay in the regular rate results in an overstatement of damages.

**C. Mr. Breshears also assumes that the plaintiffs are similarly situated.** Mr. Breshears calculations presume that the plaintiffs are similarly situated, but substantial differences exist in various locations of the company. One example is meal expense reimbursements, another is travel reimbursement rates, another is whether a flat rate is paid for local driving and if so, what that flat rate is, and another is how the local area is defined. Contrary to Plaintiffs' First Amended Complaint, it is not true that "the damages for class members can be easily calculated by a simple formula."[31]

As mentioned in my previous report, it is my understanding that the typical meal allowance paid by Intertek is $5 per meal, although rates do vary by location, as is evident from Table 6 below, which summarizes the meal policies at the locations which have 10 or more opt-ins, combining it with information from the GSA per diem rates, which are shown in more detail in Table 7.

---

[31] Plaintiffs First Amended Complaint, p. 12.

# ⌐┐ Employment Research Corporation

| Table 6: Meal Policy Summary for Locations with Ten or More Opt-Ins[32] | |
|---|---|
| **Location** | **Meal Policy** |
| Pasadena, TX/ Red Bluff/ Houston Ops | $5.00/day |
| Signal Hill, CA | Actual expenses reimbursed and must submit receipts. Meals reimbursed for working through a meal period. |
| Texas City, TX | $10/day or $15/day, depending on duties |
| Corpus Christi, TX | $5.00 for work covering a meal period |
| Carteret, NJ | $10 meal allowance when travelling outside a 20 mile radius and when working through a meal period or when working 10 consecutive hours within a 20-mile radius or when working in Anchorage for 16 hours unless vessel provides food, or full reimbursement when travelling overnight[33] |
| Romeoville, IL | $8/meal when working through a meal period. |
| Essington/ Philadelphia, PA | $5/meal for work covering a meal period |
| Nederland, TX | $5/meal for work covering a meal period |
| St. Rose, LA/ New Orleans, LA | $4.50 if working through a meal period |
| Marion, AR/Memphis TN | $5/meal if working over a meal period |
| Lake Charles/Sulphur, LA | $4.50 if working over a meal period |

Meal reimbursement policies vary significantly by location; however, from my review of the policies it appears that meal policies are designed to reimburse for expenses incurred by the employee.

In the case of Carteret, NJ, meal payments are designated by the CBA. According to the CBA and the declaration of Earl Smith, the employee is reimbursed $10 a meal when travelling outside a 20 mile radius or when working 10 consecutive hours within a 20-mile radius or when working in Anchorage for 16 hours unless the vessel provides food, or full reimbursement when travelling overnight. Lake Charles/Sulphur, LA and St. Rose, LA/New Orleans, LA pay $4.50 per meal when working over a meal period, whereas some other locations pay $5. In Signal Hill, employees submit receipts for meals and are reimbursed for the actual cost of those meals.

The above analysis demonstrates the considerable variation in the policies by location. Such differences imply that plaintiffs from different locations may not be similarly situated. Similar variations in mileage policies exist, as discussed previously.

---

[32] Information based on declarations from branch managers, expense records and Carteret CBA.

[33] Raised from $9 due to complaints that $9 was insufficient (Earl Smith declaration).

# ⌐¡ Employment Research Corporation

**D. Mr. Breshears erroneously includes all meal and mileage reimbursement in the regular rate of pay.** Mr. Breshears' calculation assumes that all meal and mileage reimbursements should be included in the regular rate. This assumption is incorrect for the following reasons:

1. **Intertek employees incur job-related expenses in the course of their work.** Intertek employees are inspectors. They are not typically sitting in an office during regular business hours. Rather, in some cases they are driving hundreds of miles per week to perform inspections, they frequently work through meal periods and are required to be on barges, or on the road during meal hours, and often work beyond 8 hours in a single day. The amount they typically receive per meal ($5) is very low due to commonly accepted meal reimbursement rates, such as the GSA rate. Some employees may receive only $5 in a day, wheras others may receive up to $40 per day. In other instances, employees are reimbursed by submitting meal receipts. When these amounts received in a day are added together, they may not even cover a single dinner, although the employee is required to work through the dinner hour.

   It is important to remember that Intertek employees are often traveling. This may involve out of town travel, or travel to a location, or offshore on a barge, where they are not at liberty to return home for lunch or supper. Section 778.217 (d) reads, in part:

   > **778.217 (d) If the employer reimburse the employee for expenses normally incurred**
   >
   > (d) Payments for expenses personal to the employee. The expenses for which reimbursement is made must in order to merit exclusion from the regular rate under this section, be expenses incurred by the employee on the employer's behalf or for his benefit or convenience.

   Most of the expenses incurred by Intertek employees are anything but normal everyday expenses. Intertek employees may drive long hours to terminals, refineries and customer locations as part of their job duties. They may be required to wait several hours before they are able to perform their inspections or wait for results at a laboratory. They drive to locations which are not their office, and are often required to work through normal meal periods for the convenience of the employer.

2. **Reimbursements are not disproportionately large.** If a determination is made that some reimbursement made by Intertek should be included in the regular rate, § 778.217(c) seems to imply that only the excess portion of the reimbursements would go into the regular rate.

   > (c) Payments excluding expenses. It should be noted that only the actual or reasonably approximate amount of the expense is excludable from the regular rate. If the amount paid as "reimbursement" is disproportionately large, the excess amount will be included in the regular rate.

# ⌐┐ Employment Research Corporation

Several locations pay a low price (from $4.50 to $5.00) per meal.  It would seem that if the employees regularly travel outside a certain radius or work over the supper hour (or more than 10 hours in a day), these payments would provide a consistent way of reimbursing the employees for the approximate expenses they incurred, either for supper or for on the road travel.  Given that the total amounts of the reimbursements are far below the per diem rates specified by the GSA, and in most cases even below the rate for a single dinner ($23-36), it is likely that these payments provide a reasonable approximation to expenses incurred and are certainly not disproportionately large. Travel is another example of a time when meal reimbursements would not be considered part of the employee's salary.  There may be other instances, such as the fact that employees are required to be offshore or on barges and cannot return home for meals, or the fact that they work long hours and may even be on 24-hour call after working a 16 hour day (as testified to by Mr. Canales).  While it is likely that meal reimbursements approximate actual expenses, the actual circumstances of the individual employees could vary by factors including differing meal reimbursement policies in each location, whether or not the employee is subject to a collective bargaining agreement, job title (inspector vs. dispatcher), schedules and assignments, supervisor implementation of the meal policies and more.

To benchmark the typical cost of a meal, I consulted the U.S. General Services Administration (GSA) per diem rates for meals and incidental expenses.  According to the GSA, allowances for meals and incidental expenses can vary by geographic location, but are categorized into 6 groups, as shown in the table below.

| Table 7: Meals and Incidental Expense per diem rates specified by the GSA | | | | | | |
|---|---|---|---|---|---|---|
| **Type of Expense** | **$46 rate** | **$51 rate** | **$56 rate** | **$61 rate** | **$66 rate** | **$71 rate** |
| Continental Breakfast/ Breakfast | $7 | $8 | $9 | $10 | $11 | $12 |
| Lunch | $11 | $12 | $13 | $15 | $16 | $18 |
| Dinner | $23 | $26 | $29 | $31 | $34 | $36 |
| Incidentals | $5 | $5 | $5 | $5 | $5 | $5 |
| Meals only | $41 | $46 | $51 | $56 | $61 | $66 |
| **Meal and Incidental Expense Total** | **$46** | **$51** | **$56** | **$61** | **$66** | **$71** |
| Source: www.gsa.gov/portal/category/21287 | | | | | | |

It should be noted that the smallest amount for any meal in any group is $7 for breakfast in the lowest cost area of the country.  This exceeds the typical meal allowance of $5 per meal paid by Intertek by $2, or 40%.  The highest allowance is $36 for dinner.

# ☐ Employment Research Corporation

Based on these data, it remains my opinion that Intertek's typical meal allowance of $5 does not exceed the cost of a typical meal.  Even in locations where a larger meal allowance is paid, such as Carteret, where a meal allowance could be as much as $40 per day, the GSA rate of $66 still exceeds the Intertek allowance paid.

b. **Mr. Breshears includes in the regular rate expenses incurred during out-of-town travel, such as meal and mileage reimbursements.**

Since Mr. Breshears' analysis adds all meal and mileage reimbursements to the regular rate, even the meal and mileage expenses in the following examples would be added to the regular rate according to his methodology.  There are many similar examples.

| Table 8: Meal and Mileage Expenses Incurred During Out-Of-Town Travel | | | | | |
|---|---|---|---|---|---|
| Name | Date | Expense Type | Description | Amount | Included in the regular rate by Breshears |
| Blansett, M | 16-Sep-12 | MEALS | Waiting on barges to finish at gateway | 20 | Y |
| Blansett, M | 16-Sep-12 | HOTEL | waiting an barges to finish at gateway | 150.45 | N |
| Blansett, M | 17-Sep-12 | MEALS | Drove back from ST Louis | 15 | Y |
| Blansett, M | 17-Sep-12 | MILEAGE | Closed WEB 203&209 sampled s/t 71&002 took smples to vertex and opened CTCO 337 | 102.9 | Y |

Mr. Blansett, an inspector based in the Marion, AR/Memphis, TN office, was apparently on an out-of-town trip on 9/16/12, since he expensed a hotel on that day.  Mr. Breshears includes even these meal expenses in the regular rate, which were incurred on an out-of-town trip.

E. **Mr. Breshears includes people who were not dispatchers or inspectors.**  Mr. Breshears' calculations include people who were not inspectors or dispatchers during the relevant statute of limitations period.  The inclusion of these individuals causes his damages to be overstated. (see Appendix D)

F. **Mr. Breshears includes weeks when people were not dispatchers or inspectors**.  Some individuals changed jobs during the relevant period, so that they were inspectors or dispatchers for part of the period only.  Mr. Breshears includes weeks for some of these individuals when they were not inspectors or dispatchers, but Supervisors or Coordinators.  There are 6 such

# ☑ Employment Research Corporation

people, and the inclusion of the weeks in which they were not inspectors or dispatchers causes Mr. Breshears' calculations to be overstated.

**G.  Mr. Breshears includes dispatchers in his calculation, when dispatchers are a separate class.**
Mr. Breshears includes calculations for 11 dispatchers who were never inspectors, and who are not included in a class with inspectors (see Appendix E).

**H.  Mr. Breshears only provides a calculation going back three years from the opt-in dates, and fails to provide information on a two-year period.**  In order for the trier of fact to go back three years from the opt-in dates, there would have to be a determination made that violations were willful.  Given the complexity of the payments and the questions about the fact that Intertek's meal and mileage reimbursements were reasonable and not excessive, to only provide the trier of fact with estimates for a three-year period is misleading.

## VII.    General Comments on both Dr. Speakman's and Mr. Breshear's reports

The reports of the Plaintiffs' two experts are misleading, inconsistent and fail to take into account the nature of the work and driving done by Intertek inspectors.  While I addressed each report separately, the following examples illustrate the inconsistencies in the reports when considered together.

To illustrate, Mr. Breshears claims that the damages for Mr. Ubence Longoria should be $183,495.25. To calculate damages, Mr. Breshears assumes that *all* mileage expenses should be counted as wages, presumably due to his assumption that the yearly auto allowance of $4,200 should be sufficient to cover all auto expenses incurred.  However, this analysis is clearly incorrect.  This can be seen by examining Mr. Longoria's travel records for a five month period.[34]  During this period from 9/4/11 to 2/4/12, Mr. Longoria made 55 round trips from Brownsville to Corpus Christi and four round trips to and from Delmita to Brownsville.  According to Google Maps, Brownsville to Corpus Christi is 322 miles round trip and Brownsville to Delmita is 98 miles round trip.  This is just the city to city mileage, excluding any in town or local driving.  Therefore, at minimum, including only long distance trips and excluding any local driving at all, Mr. Longoria drove 18,102 miles in a five month period.  During this period, he would have received a $1,750 auto allowance.  In this case, Mr. Breshears has assumed that Mr. Longoria should have received less than 10 cents per mile as reimbursement from Intertek, which conflicts with Dr. Speakman's report stating that he should have received a rate of 23 cents.  As noted earlier, the rate advocated by Dr. Speakman is less than the 2012 IRS rate of 55.5 per mile, which is clearly allowed (but not set as a maximum) by the Field Operations Handbook of the Department of Labor.  In addition, if we assume that the number of weekly miles stated in Mr. Longoria's interrogatory answers (250 per week) represents his in-town or local mileage for which he does not turn in vouchers, he would then have driven 23,602 miles in this period, which would mean that Mr. Breshears implicitly uses a reimbursement rate as low as 7.4 cents per mile.

---

[34] INTERTEK 30930 - 30961.

# ⌐j Employment Research Corporation

For the five month period, Mr. Longoria received $10,400 in mileage reimbursement from Intertek, which includes $1,750 for the auto allowance and $8,650 for mileage reimbursements at a rate of $150 per trip to Brownsville and $100 per trip to Delmita.[35] If he had been reimbursed at the IRS rate of 55.5 cents, he should have received $13,099 for these miles driven. If he had driven no local mileage at all (which is actually impossible since the Google maps are city to city and do not include driving in and around the terminal), he should have received $9,956. It seems clear from this analysis that Mr. Longoria's mileage payments were reimbursements for expenses he incurred.

Examining the expense records and vouchers of Mr. Phillip Glud, a Corpus Christi employee for whom Mr. Breshears proposes damages of $298,555.60, shows that he frequently drives to many different locations, works offshore for several days at a time, and his records include hotel expenses indicating his work sometimes include overnight travel. Although Mr. Breshears only includes meal and mileage expenses in his damages calculations, some of these meals are for times when Mr. Glud has traveled overnight and/or has 18-24 hours at work often "offshore."[36] Assuming that his mileage was reimbursed at 30 cents per mile as indicated in his signed expense reports, Mr. Glud drove as much as 86,951 miles on an annual basis. If his car allowance alone were used to reimburse him for these miles, he would have received approximately 2 cents per mile as an auto allowance. We did not analyze the numerous individual locations to which he traveled and which are detailed in these 413 scanned pages of vouchers and receipts, since they varied so frequently and often mentioned specific barge names rather than terminals.

In summary, the preceding examples are simply illustrative of the inconsistent and problematic methodology used by the plaintiffs' experts. Earlier in the report, I have shown that based on my review, mileage reimbursements are reasonably approximate to expenses incurred.

## VIII.   Damages

Although I have not found evidence that Intertek paid its employees improperly, should the court conclude that payment of damages is appropriate, I have made various calculations that could be useful to a trier of fact.

Damages, as well as liability, in this matter are an individual inquiry, varying with each employee's costs incurred, location, assignments, vehicle, insurance, miles driven, the existence of an applicable CBA, the employee's method of recording expenses, and other factors. The damages calculations presented here are based on the payroll and expense data provided to me. The payroll data covers the period

---

[35] The branch raised the rate from Brownsville to $175 and Delmita to $125 in 2013. If this increase were due to additional in-town mileage, it seems reasonable that this increase was needed to appropriately reimburse inspectors for driving expenses incurred in and around the terminal or job site, to and from hotels and any other local driving while out of town.

[36] Mr. Glud's expense vouchers (INTERTEK 29691 to INTERTEK 30103).

# Employment Research Corporation

from 6/27/2008 to 12/21/2012 and the expense data covers the period from 12/14/2008 to 11/12/2012.

The summary below includes estimates for both a 2-year and a 3-year period prior to each plaintiff's opt-in date. Damages are calculated assuming all expenses should have been added to the regular rate, which is an incorrect assumption. Even if the court were to determine that some expenses were not reimbursements, there are certainly expenses that were appropriate to reimburse, such as hotel expenses and meals for out-of-town travel. Due to the nature of the data, excluding these expenses is difficult; however, should the court request it, I can reduce the included expenses by a percentage.

Damages are computed under two calculation methods and three scenarios. Method A shows the calculation that would be appropriate if the court were to decide that reimbursements are to be included in the regular rate and use a half-time rate for overtime. Method B, which is shown in Appendix F, would be appropriate if the court were to decide that those paid under FWW should have been paid as hourly, and the reimbursements should be treated in the same manner Mr. Breshears treats them for hourly employees, dividing them by total hours and multiplying by .5 for the overtime rate. Scenario 1 adds mileage and meal expenses in the regular rate, Scenario 2 adds only mileage reimbursements into the regular rate, and Scenario 3 adds meals reimbursements into the regular rate.

Under the fluctuating workweek method, the regular rate for all hours worked must not fall below the minimum wage. It is acceptable to pay the overtime premium at a rate lower than the minimum wage, provided it is at least half the regular rate. By raising the overtime premium to the minimum wage, Intertek paid more than they had to under the FLSA. As such, it is my understanding from counsel that Intertek should get a credit for this overpayment. A summary without including the credit appears in Appendix G.

Further, it is my understanding that dispatchers are a separate class, and should not be combined with inspectors. If requested to do so, I can provide summary tables which exclude dispatchers.

Details on the data and assumptions used in the calculations are included in Appendix H.

| Table 9: Calculated Damages Various Scenarios, with credit applied for overpayment of overtime premium | | | |
|---|---|---|---|
| | | Method A - Reimbursements are included in the regular rate and divided by total hours. Overtime for reimbursements is paid at .5. | |
| Scenario | Added to Regular Rate | Two Years from Opt-In Date | Three Years from Opt-In Date |
| 1 | Both meals and mileage | $281,981 | $300,274 |
| 2 | Mileage only | $205,374 | $215,895 |
| 3 | Meals only | $61,345 | $66,559 |

# ☑ Employment Research Corporation

**Conclusion**

Based on my analysis, the conclusions reached by Dr. Speakman are without merit.  His contention that only the incremental cost of driving is attributable to work is unfounded and incorrect, especially in light of the deposition testimony of the plaintiffs and the DOL Field Operations Handbook.  His example of Mr. Cary is not a representative example, and is misleading to a trier of fact.  His assumption that the plaintiffs are similarly situated is unfounded, as there are vast differences between branch facilities, and even within branch facilities.  Intertek branches are very different; hence expense reimbursements and mileage allowances vary by branch.  Some branches pay a flat rate for local trips.  Some pay a different rate based on where the inspector travels.  Some pay mileage to locations less 10, 20 or 40 miles.  The attempt by Dr. Speakman to generalize these policies leads to very misleading results.

I reviewed the report of Mr. Breshears and found numerous problems with his calculations.  I find his calculations to be unreliable and not helpful to a trier of fact.  His calculation formula for FWW employees is fundamentally flawed, he includes pay types that are not relevant to the present case and he includes numerous people who are not eligible for damages.

My examination of the records indicates that the amounts paid by Intertek as reimbursements for meal and mileage costs, as well as auto allowance are not excessive and reasonably approximate actual expenses.

The contents of this report represent my opinion to a reasonable degree of professional certainty. This report is based on analysis conducted by me or by members of the staff of Employment Research Corporation under my direction. I reserve the right to alter or supplement my opinion should additional information become available, including but not limited to additional expense, reimbursement, timekeeping, payroll records and vehicle/driving data.

Sincerely,

*Malcolm Cohen*

Malcolm S. Cohen, Ph.D.
President, Employment Research Corporation